UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JANE DOE,

                Plaintiff,

    v.

NEW YORK UNIVERSITY,

                Defendant.

21-Cv-2199 (SHS)

OPINION & ORDER

---

SIDNEY H. STEIN, U.S. District Judge.

    Plaintiff Jane Doe, a first-year student at defendant New York University ("NYU"), brings this breach-of-contract action for specific performance pursuant to this Court's diversity jurisdiction, 28 U.S.C. § 1332(a). (Compl., ECF No. 4.) Doe claims that NYU violated the terms of the parties' implied contract when the university suspended her for allegedly failing to adhere to NYU's COVID-19 safety policies. On March 17, this Court granted Doe a restraining order temporarily enjoining NYU from enforcing its suspension pending the resolution of Doe's motion for a preliminary injunction. (ECF No. 13.) On April 14, after briefing from the parties, the Court heard oral argument on that motion by teleconference. For the reasons set forth below, Doe's motion for a preliminary injunction is denied and the temporary restraining order is dissolved. Her motion to proceed under a pseudonym is granted.

I. BACKGROUND

    A. NYU's Response to the COVID-19 Pandemic

    Plaintiff Doe began her freshman year of college in August 2020, as the COVID-19 pandemic insinuated itself across the country and disrupted daily life. College campuses have been a hotbed of this disruption, with educational institutions struggling to maintain in-person learning without enabling reckless student behavior and potential "super-spreader" events. *See* Shawn Hubler & Anemona Hartocollis, *How Colleges Became the New Covid Hot Spots*, N.Y. Times (last updated Oct. 26, 2020), https://www.nytimes.com/2020/09/11/us/college-campus-outbreak-covid.html.

    NYU, located in downtown Manhattan, has taken extensive steps to control the virus's spread while remaining open for in-person instruction. In addition to a comprehensive, weekly testing program, NYU has implemented a series of health and safety protocols restricting student behavior both on- and off-campus. These protocols have been strictly enforced through disciplinary proceedings and sanctions, including suspensions, and NYU has maintained a COVID-19 positivity rate of one percent or less this academic year. That compares to a New York City positivity rate averaging

approximately six percent during the same period. (*See* Def.'s Mem. at 1 n.2, ECF No. 33 (citing *NYC COVID-19 Testing Data*, New York Univ. (last updated Apr. 27, 2021), https://www.nyu.edu/life/safety-health-wellness/coronavirus-information/nyc-covid-19-testing-data.html).)

NYU promulgates its health and safety protocols through several interlocking avenues. At the highest level, NYU regulates conduct pursuant to its University Student Conduct Policy, which contains a number of broad proscriptions on harmful student behavior. ("Student Conduct Policy," Compl. Ex. D, ECF No. 4-4.) As relevant here, Policy B1 prohibits: "Engaging in or threatening to engage in behavior(s) that, by virtue of their intensity, repetitiveness, or otherwise, endanger or compromise the health, safety, or well-being of oneself, another person, or the general University community, or that disrupt the effective continuation of the academic/education process for individual students or for the general University community." (*Id.* at 2.) Section IV of the Student Conduct Policy provides that off-campus conduct "should generally be subject only to the consequences of the applicable authority," but explicitly reserves the right to "take student disciplinary action for conduct occurring outside the University context which substantially disrupts the regular operation of the University or threatens the health, safety, or security of the University community." (*Id.* at 6.)

Additionally, in advance of the 2020 school year, NYU adopted a "Policy on Requirements Related to Access to NYU Buildings and Campus Grounds Resulting from the COVID-19 Pandemic." ("COVID-19 Access Policy," Compl. Ex. B, ECF No. 4-2.) This policy mandates face coverings and physical distancing while in NYU buildings, prohibits non-essential visitors to NYU buildings, and establishes a confidential "COVID Compliance Line" for the reporting of incidents of noncompliance. (*Id.* at 2-3.) NYU also added Policy E3 to its Student Conduct Policy, prohibiting violations of the COVID-19 Access Policy "or any related governmental orders issued concerning public health." (Student Conduct Policy at 3.)

In order to effectuate and clarify these formal policies, NYU has issued extensive COVID-related information to its students throughout the school year. These frequent updates, provided by email, video, text, and online posting, have described both the types of activities prohibited and the potential sanctions for misconduct. In July 2020, more than one month before the school year began, students received an email informing them that NYU "plans to strictly enforce the new safety and health rules we are putting in place," including through the use of "interim suspension." (Jolley Decl. Ex. 1, ECF No. 28-1.) Students were then required to watch a video in mid-August instructing them to follow NYU's COVID-19 policies off-campus and to avoid bars and parties, and informing them that students found in violation may face penalties up to and including "suspension and de-enrollment." (*Id.* ¶¶ 24-27, Ex. 3, ECF No. 28-3.) After

viewing the video, students were required to submit an acknowledgement agreeing to "abide by all applicable policies and procedures and make conscious efforts to reasonably support the health and safety of myself and others within our community," and recognizing that "any violations may be subject to disciplinary action." (*Id.* ¶ 27.) NYU's electronic records show that plaintiff Doe viewed this video and submitted the required acknowledgement on August 18. (*Id.* ¶ 27.)

On September 3, as fall classes began, students received an email entitled: "Keeping Each Other Safe: Additional Guidance on University Expectations." (*Id.* Ex. 4, ECF No. 28-4.) This "additional guidance" gave examples of safe and unsafe activities, and expressly instructed students to "***stay away from gatherings where there are no masks or distancing, even at off-campus private residences.***" (*Id.* (emphasis in original).) It also informed students that, "[i]n general, if a student is found to have participated in a gathering that impacts the community's health and safety, including by violating public health guidelines, they will likely be suspended for one academic semester." (*Id.*)

The university updated and reinforced these guidelines at the onset of the spring semester in January 2021. On January 15, students were required to watch another video, which again informed them that attendance at "any gatherings where masks and physical distancing are not appropriately observed, even when it occurs off-campus," is grounds for sanctions up to and including "suspension from the university." (*Id.* ¶¶ 33-34, Ex. 7, ECF No. 28-7.) NYU's electronic records show that Doe spent nearly eight minutes watching this video, after which she signed another required acknowledgement. (*Id.* Ex. 8, ECF No. 28-8.)

Thereafter, on the first day of classes, students received an updated version of the September 3 guidance, which reiterated and emphasized that students were required to "**stay away from gatherings where there are no masks or distancing, even at off-campus private residences**," and that students found participating in such gatherings "**will likely be suspended for at least one academic semester.**" (*Id.* Ex. 9, ECF No. 28-9 (emphasis in original).) This email also linked to a separate bulletin, posted the same day, entitled: "Word on Gatherings." (*Id.* Ex. 10, ECF No. 28-10.) This bulletin reiterated that "the University has made the choice to prohibit all large, non-essential, in-person gatherings at this time," and expressly provided: "Regardless of the setting or the reason, the University's policies on mask-wearing and physical distancing remain in effect for all gatherings, and you will be held accountable for observing NYU's safety and health rules and any public health guidelines even if you are off-campus." (*Id.*)

### B. Plaintiff Doe's Disciplinary Proceedings and Suspension

Doe began her freshman year at NYU in the fall of 2020, and she is now in her second semester of study. (Doe Decl. ¶ 3, ECF No. 2-3.) She resides on campus in an NYU dormitory, though she has returned to her home state of California during the

pendency of these proceedings. This semester, Doe has been attending her classes remotely, with the exception of one in-person lab course; since the day the Court granted Doe a temporary restraining order, she has attended her lab remotely as well. (Doe Decl. ¶¶ 15-16.)

This action arises out of an indoor event Doe attended at an off-campus apartment on January 30, 2021—two days after the spring semester began. (Compl. ¶ 61.) Doe depicts this event as a "private dinner among the plaintiff and her fellow students," at which there were "only seven" people in attendance, including Doe. (*Id.*) Doe represents that two days prior to the dinner, she tested negative for COVID-19, and that she then "remained alone" until the dinner. (*Id.* ¶ 62.) She also represents that she "confirmed that all other attendees had tested negative" before attending. Doe claims that she wore a mask and practiced social distancing at all times while traveling to and from the dinner; that she, and all other attendees, wore masks while in the apartment; and that the "only time that I and the other diners removed [our] masks was when the food was delivered and we sat down to eat our meals." (Doe Decl. ¶¶ 26-29.) Doe further claims that, as the meal concluded, someone suggested a "very quick photo," immediately after which all attendees "put our masks on and said our goodbyes." (*Id.* ¶¶ 30-31.)

Unsurprisingly, this "very quick photo" was very quickly posted on social media, and two days later, a student filed an anonymous complaint with NYU's Office of Student Conduct and Community Standards ("OSC"). (Spera Decl. ¶ 8, ECF No. 30.) The complainant represented that he or she "saw some peers of mine the other night having an indoor unmasked gathering of what looks like to be at least 7-8 people via someone's post on a Snapchat story," and attached a copy of the photo. (*Id.*) The photo depicts Doe and three other students packed tightly together indoors, posing for a selfie. Multiple other students are visible in the background, with no evidence of masks or social distancing. Because "the conduct portrayed in the photo indicated that NYU students may have been engaging in an indoor gathering without masks or social distancing—conduct that would violate the Student Conduct Policy and potentially the COVID Access Policy," OSC began an investigation. (*Id.* ¶ 10.) Indeed, unless the selfie was photoshopped—and no party raises that possibility—the photo indicates that NYU students *were* "engaging in an indoor gathering without masks or social distancing."

Jessica Spera, OSC's Assistant Director, met with the four students who posed for the photo and ultimately found all four responsible for violating Section B1 of the Student Conduct Policy, which prohibts "behavior(s) that, by virtue of their intensity, repetitiveness, or otherwise, endanger or compromise the health, safety, or well-being of oneself, another person, or the general University community," and Section E3, for violating the NYU COVID-19 Access Policy "or any related governmental orders issued

4

concerning public health." (*Id.* ¶¶ 28-30.) Spera describes the students as providing a shifting story, and represents that "[d]uring the course of these meetings, it became clear to me that none of the four students [was] being fully forthright." (*Id.* ¶ 25.) She attaches an email from the first of the four, in which the student claimed only that the attendees "had our masks on at all times when we were outside" the apartment—but not during the event itself, as plaintiff asserts. (*Id.* Ex. 12, ECF No. 30-2.) Spera represents that "the number of people who were reported to be at this gathering took shape only after I suggested that there were at least seven to eight people visible in the photograph." (*Id.* ¶¶ 17, 28.)

Spera concluded that not only was the students' portrayal of the event not credible, (*Id.* ¶ 25), but also that the behavior depicted in the photograph, "alone, was an unsafe, potential transmission event" in violation of both NYU policy and New York state and city guidelines. (*Id.* ¶¶ 26, 28 (emphasis in original); *see* Feinberg Decl. ¶¶ 10-18, ECF No. 32.) (discussing applicable state and city guidelines).) The four students were therefore suspended for the remainder of the semester, which Spera claims to be "consistent with the penalties imposed by OSC on other students found to have attended unsafe on- or off-campus parties." (*Id.* ¶ 30.)

Despite plaintiff's representation in her initial filings that "[p]rior to the events of this case, NYU has never disciplined me or charged me with any grounds for discipline" (*see* Doe Decl. ¶ 4), this incident was not Doe's first disciplinary proceeding for potential violations of NYU's COVID-19 policies. Indeed, Doe had been anonymously reported to OSC on two separate prior occasions. The first incident occurred on August 29, 2020, soon after students arrived on campus for fall classes. The report "involved a dormitory-wide group text, in which [Doe] had texted that her boyfriend planned to travel from California to see her, apparently without quarantining." (Fread Decl. ¶ 6, ECF No. 29.) An OSC official met with Doe virtually to discuss the matter, and to reiterate the importance of following NYU and New York COVID-19 guidelines. (*Id.* ¶ 7.) Thereafter, the official sent Doe an email stating that "NYU is responding swiftly and seriously to violations of applicable policies," and included links to the Student Conduct Policy and COVID-19 Access Policy. (*See* Pl.'s Supp. Mem. Ex. 2, ECF No. 19-3.) OSC ultimately determined that the "incident did not merit a formal charge process, as no violation had yet actually occurred." (Fread Decl. ¶ 6.)

Less than a week later, Doe was reported again, this time for allegedly attending a "rooftop gathering without following public health guidelines, therefore compromising the health and safety of the NYU community." (Pl.'s Supp. Mem. Ex. 3, ECF No. 19-4.) On this occasion, OSC filed formal charges alleging violations of Sections B1 and E3—the exact same sections pursuant to which Doe was ultimately suspended. (*Id.*) At Doe's

disciplinary conference, she denied attending such a party. Because the investigating OSC official "did not have any evidence to the contrary, and [Doe] appeared to be sincere and credible" (Fread Decl. ¶ 10.), Doe was found not responsible for a violation. Directly after the conference, OSC sent Doe an email once again reminding her of NYU's expectations and attaching all applicable university policies and guidance. This included the recently promulgated September 3 guidance, in which students were warned to "*stay away from gatherings where there are no masks or distancing, even at off-campus private residences,*" under penalty of a one-semester suspension. (Jolley Decl. Ex. 4 (emphasis in original).)

Although Doe was found not responsible on both occasions, Spera represents that these prior incidents further supported her decision ultimately to suspend Doe, as they "confirmed in my mind that [Doe] had no valid basis to claim ignorance of the scope of NYU's health and safety protocols." (Spera Decl. ¶ 27.) Doe was suspended for the spring semester on February 18, and she filed an administrative appeal on February 25. (*Id.* ¶ 31.) One week later, her appeal was denied, and her suspension was finalized. (*Id.* ¶ 36.)

## II. DISCUSSION

Plaintiff filed this action in mid-March, moving by order to show cause for a preliminary injunction prohibiting NYU from enforcing Doe's suspension and seeking a temporary restraining order during the pendency of the application for a preliminary injunction. Doe alleges that NYU breached the parties' implied contract when it suspended her for the above-described conduct. (Compl. ¶¶ 12-13.) In particular, Doe claims that the Student Conduct Policy was a "binding compact" between NYU and its students, which did not allow the university to sanction conduct at off-campus, private events. (*Id.* ¶¶ 12, 31.) She claims, moreover, that the university "failed to support its finding of a violation by legally sufficient evidence." (*Id.* ¶ 12; Pl.'s Mem. at 17, ECF No. 2.) She alleges that she will be "irreparably harmed" if she is forced to "forfeit the benefit of the work she already performed this semester." (Pl.'s Mem. at 14-15.)

On March 17, this Court held a teleconference at which it granted Doe a temporary restraining order enjoining NYU from enforcing its suspension until the determination of the motion for a preliminary injunction. (ECF No. 13.) The Court now denies Doe's motion for preliminary injunction, as she has failed to show a "likelihood of success on the merits." *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.* 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Lynch v. City of New York,* 589 F.3d 94, 98 (2d Cir. 2009)).

### A. This Court Has Subject-Matter Jurisdiction over Article 78 Claims

The parties first dispute whether the Court has subject-matter jurisdiction to hear this state-law diversity action. Without subject-matter jurisdiction, "the district court lacks the power to adjudicate the merits of the case." *Carter v. HealthPort Techs., LLC,* 822

6

F.3d 47, 54 (2d Cir. 2016); *see* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Therefore, the Court must begin with this inquiry. On the face of Doe's complaint, jurisdiction is plainly appropriate: Doe, a domiciliary of California,[1] brings this state-law action against NYU, a citizen of New York, alleging damages in excess of $75,000. Accordingly, the requirements of 28 U.S.C. § 1332(a) appear to have been met.

Nonetheless, NYU contends that an Article 78 proceeding is the proper route for judicial review of university disciplinary matters, not a separate action. Under New York law, Article 78 of the Civil Practice Law and Rules ("CPLR") establishes a streamlined process for challenging the determinations of public bodies and administrative agencies. Article 78 has a jurisdictional and a substantive element. Jurisdictionally, Article 78 requires that an Article 78 proceeding be brought in New York Supreme Court. N.Y. C.P.L.R. § 7804(b). New York courts have held that "the Supreme Court has exclusive jurisdiction over Article 78 proceedings," with the exception of certain specified proceedings. *Vanderbilt Museum v. American Assoc. of Museums*, 449 N.Y.S.2d 399, 403 (N.Y. Sup. Ct. 1982). Substantively, the "only questions that may be raised" in an Article 78 proceeding are whether the challenged body "failed to perform a duty enjoined upon it by law," or whether its actions were "without or in excess of jurisdiction," "arbitrary and capricious or an abuse of discretion," or not "supported by substantial evidence." N.Y. C.P.L.R. § 7803(1)-(4).

Although Article 78 proceedings generally involve challenges to the actions of government agencies, the New York Court of Appeals has held that because the "administrative decisions of educational institutions," including private universities, "involve the exercise of highly specialized professional judgment . . . CPLR article 78 proceedings are the appropriate vehicle," as they "ensure that the over-all integrity of the educational institution is maintained." *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 92 (1999).

NYU urges that Article 78, as a "novel and special creation of state law . . . 'designed to facilitate a summary disposition of the issues presented,'" *Lucchese v. Carboni*, 22 F. Supp. 2d 256, 258 (S.D.N.Y. 1998) (quoting *Davidson v. Capuano*, 792 F.2d 275, 280 (2d Cir. 1986)), and pursuant to which jurisdiction is vested exclusively in New York Supreme Court, deprives this Court of jurisdiction. NYU also concedes that the case law on this point is "unclear." (Def.'s Mem. at 15.) The U.S. Court of Appeals for the Second Circuit has not yet conclusively resolved the question of federal court jurisdiction over Article 78 claims. It is also true that federal courts routinely *decline* to

---

[1] "Courts have consistently recognized that out-of-state college students are temporary residents and not domiciliaries of the states in which they attend college, because residence at college is chosen primarily for the short-term purpose of pursuing an education." *Hakkila v. Consol. Edison Co. of New York*, 745 F. Supp. 988, 990 (S.D.N.Y. 1990).

exercise supplemental jurisdiction over Article 78 claims pursuant to 28 U.S.C. § 1367(c), citing the special solicitude afforded to this "purely state procedural remedy." *Camacho v. Brandon*, 56 F. Supp. 2d 370, 380 (S.D.N.Y. 1999); *see also Birmingham v. Ogden*, 70 F. Supp. 2d 353, 372 (S.D.N.Y. 1999) ("[F]ederal courts are loath to exercise jurisdiction over Article 78 claims."); *Lucchese*, 22 F. Supp. 2d at 258 (S.D.N.Y. 1998) ("Article 78 proceedings were designed for state courts, and are best suited to adjudication there."); *Herrmann v. Brooklyn Law School*, 432 F. Supp. 236, 240 (E.D.N.Y. 1976) ("[T]his special proceeding designed to accommodate to the state court system is best suited to that system.").

Unlike this Court's supplemental jurisdiction, however, federal diversity jurisdiction is nondiscretionary. *See* 28 U.S.C. § 1332(a). Accordingly, the question presented is not whether the Court *should* exercise jurisdiction, but whether it *may*. The cases in this district are split. *Compare Cartagena v. City of New York*, 257 F. Supp. 2d 708, 709–10 (S.D.N.Y. 2003) ("State law does not permit Article 78 proceedings to be brought in federal court, and hence I conclude that I do not have the power to exercise supplemental jurisdiction over Cartagena's Article 78 claims."), *with Casale v. Metro. Transp. Auth.*, 2005 WL 3466405, at *6 (S.D.N.Y. 2005) ("State law may direct that '[a] proceeding under this article shall be brought in [state] supreme court,' but this requirement has nothing to do with whether the proceeding falls within a federal jurisdictional statute.").

This Court agrees with the latter view and now holds that the federal courts may properly exercise diversity jurisdiction over Article 78 claims. Indeed, just as Article 78 requires that its proceedings "*shall* be brought in supreme court," N.Y. C.P.L.R. § 7804(b) (emphasis added), so too does section 1332(a) require that "[t]he district courts *shall* have original jurisdiction" over diversity actions, 28 U.S.C. § 1332(a) (emphasis added). As then-Judge Mukasey pointed out in *Casale*, "[i]f such a directive" from state law "could deprive federal courts of jurisdiction, state legislatures, not Congress, would control the power of the federal judiciary." 2005 WL 3466405, at *6.

This action, which involves a disciplinary dispute between a private individual and a private university, illustrates the incongruity of such a result. As noted above, Article 78 proceedings generally involve claims against state governmental entities, where considerations of comity and federalism caution against undue federal intervention. *See Cartagena*, 257 F. Supp. 2d at 710-11 (holding that federal courts lack Article 78 jurisdiction in part because "this Court must respect the limits imposed by the State on the rights of its citizens to hold a public authority accountable to its laws" (internal quotations omitted)). Here, however, there is no public authority involved, nor a challenge to any state action. There is only New York state's policy determination to subject certain private disputes to a streamlined, exclusive procedure with, importantly, a more deferential standard of review. *See Maas*, 94 N.Y.2d at 92. If the New York

legislature's decision divested this Court of its ability to hear cases otherwise squarely within its original jurisdiction, states would indeed hold ultimate authority over the power and jurisdiction of the federal judiciary. Such a result is plainly inconsistent with the structure of the U.S. Constitution and its Supremacy Clause. *See* U.S. Const. Art. VI, cl. 2.; *cf. McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819).

Inasmuch as exercising Article 78 jurisdiction, in a specific instance, "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern," *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)), federal courts may apply longstanding and well-established abstention doctrines to the issue of whether the federal court *should* exercise jurisdiction over the dispute.[2] Accordingly, the Court moves to the merits of Doe's claim.

### B. Legal Standard

Plaintiff seeks a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. "[A]n injunction is 'an extraordinary remedy never awarded as of right.'" *Agudath Israel of Am. v. Cuomo*, 979 F.3d 177, 179–80 (2d Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008)). In order to obtain a preliminary injunction, a plaintiff must demonstrate that she is (1) "likely to succeed on the merits," (2) "likely to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities tips in [her] favor," and (4) that "an injunction is in the public interest." *Id.* at 180; *see Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 495 (S.D.N.Y. 2018). Because plaintiff's case falls on the first prong of this test, the Court begins there.

### C. Likelihood of Success on the Merits

#### 1. *NYU's Disciplinary Decisions Should Be Evaluated Under Article 78's Deferential Standard of Review*

As an initial matter, the parties dispute the substantive law under which plaintiff's likelihood of success should be evaluated. NYU argues that even if there is federal subject-matter jurisdiction over Doe's claim—as this Court has determined there is—the

---

[2] NYU's argument that the Court should abstain pursuant to *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) is of no moment. *Burford* abstention "allows a federal court to dismiss a case only if [1] it presents 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar' or [2] if its adjudication in a federal forum 'would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996) (quoting *New Orleans Pub. Serv., Inc.*, 491 U.S. at 361). The U.S. Supreme Court has warned that "*Burford* permits 'a federal court sitting in equity' to dismiss a case only in extraordinary circumstances." *Id.* No such extraordinary circumstances exist here.

Court is bound to apply Article 78's deferential standard of review, pursuant to which a university's disciplinary determination may only be overturned if it was "in excess of jurisdiction," "arbitrary and capricious or an abuse of discretion," or not "supported by substantial evidence." N.Y. C.P.L.R. § 7803(2)-(4). Under Article 78 review, a private university's disciplinary determination will be upheld as long as it "substantially complied with its established disciplinary procedures." *Kickertz v. New York Univ.*, 25 N.Y.3d 942, 944 (2015). Moreover, a punishment may only be overturned if the Court concludes that the "measure of punishment or discipline imposed is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." *Matter of Pell v. Bd. of Educ. of Union Free Sch. Dist. No. 1*, 34 N.Y.2d 222, 233 (1974).

Doe, meanwhile, contends that she is the "master of her complaint," and that she "elected to bring her lawsuit" as a freestanding contract claim "under permissible rules of diversity jurisdiction." (Pl.'s Reply at 5, ECF No. 35.) According to plaintiff, NYU thus may not invoke Article 78's "more deferential" standard. (*Id.*) It is true that "the plaintiff is the master of the complaint" for jurisdictional purposes. *Marcus v. AT&T Corp.*, 138 F.3d 46, 52 (2d Cir. 1998). However, she is not the master of the substantive law that applies to her claim. Indeed, when sitting in diversity, neither is this Court, which must look to and apply the law of the forum state. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("There is no federal general common law."); *see also DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005) (holding that, when hearing a New York state-law claim "under our diversity jurisdiction, we are obligated to apply New York's standard of proof").

Looking to New York law, state court decisions establish that "to the extent [a] plaintiff's causes of action are, in essence, a challenge to the determination" to discipline her, she is "only entitled to article 78 review." *Kickertz v. New York Univ.*, 110 A.D.3d 268, 272 (N.Y. App. Div. 2013); *see also Ansari v. New York Univ.*, 1997 WL 257473, at *2 (S.D.N.Y. 1997) (noting that state-court review of suspensions "has been limited to Article 78 proceedings"). Here, though Doe has creatively pled her complaint as a breach-of-contract action for specific performance, there is no dispute that the essence of her claim is a challenge to NYU's sanction of suspension. As New York courts are further instructed to convert a plaintiff's errant freestanding contract action into an appropriate Article 78 proceeding, this Court will do the same here. *See Walsh v. New York State Thruway Auth.*, 24 A.D.3d 755, 756 (N.Y. App. Div. 2005) ("[T]he courts are empowered and indeed directed to convert a civil judicial proceeding not brought in the proper form into one which would be in proper form[.]" (quoting *Matter of First Natl. City Bank v. City of New York Finance Admin.*, 36 N.Y.2d 87, 94 (1975))). The Court thus concludes that Article 78's more deferential standard of review applies to Doe's claim.

### 2. *Plaintiff Has Not Shown a Likelihood of Success on the Merits*

Ultimately, the standard of review to be applied here is irrelevant, as Doe has failed to show that she is "likely to succeed on the merits" of her claim under any standard. Doe's core allegation is that NYU's health and safety protocols did not purport to, and thus could not, operate to sanction private, off-campus conduct such as the alleged seven-person dinner for which she was suspended. Doe's briefing relies on the interplay between Policy B1 and Policy E3, the two Student Conduct Policy provisions under which Doe was found liable. Doe argues that Policy B1, which prohibits "behavior(s) that, by virtue of their intensity, repetitiveness, or otherwise, endanger or compromise the health, safety, or well-being of oneself, another person, or the general University community," was only a "general student conduct policy," and that Policy E3, which incorporated the COVID-19 Access Policy, was the more specific and thus operative COVID-19 conduct policy. (*See* Def.'s Mem. at 17 ("Black letter contract law dictates that specific policies and provisions control over general ones.").) Because the COVID-19 Access Policy only purports to apply "in NYU Buildings and on Campus Grounds" (COVID-19 Access Policy at 1), Doe argues that NYU's COVID-19 enforcement jurisdiction is limited to on-campus violations.

Even taken on its own terms, this argument likely fails. It is true that the COVID-19 Access Policy applies only on campus grounds; however, the policy "does not state or even suggest that it is an 'exclusive' policy." (Jolley Decl. ¶ 22.) Moreover, though Policy E3 indeed incorporates the COVID-19 Access Policy, it also prohibits violations of "any related governmental orders issued concerning public health." (Student Conduct Policy at 3.) Doe makes much out of the fact that the subject dinner "was in full compliance with New York State guidance," as it allegedly involved fewer than 10 people, the maximum number allowed at private indoor gatherings. As NYU points out, however, the applicable guidance also required that attendees at such gatherings "comply with social distancing protocols." (*See* Feinberg Decl. ¶ 13 (quoting N.Y.R.R. § 66-3.3).)

Accordingly, in addition to determining that plaintiff's depiction of the event was not credible, OSC appropriately found that the subject photograph "itself" depicted conduct in violation of "state and city guidelines for non-essential gatherings," as prohibited by Policy E3. (Spera Decl. ¶ 28.) And though plaintiff excerpts a portion of the Student Conduct Policy stating that "[t]he University shall not use its powers to interfere with the rights of a student beyond the University environment" (Pl.'s Mem. at 16), that same provision continues on: "Notwithstanding, the University may take student disciplinary action for conduct occurring outside the University context which substantially disrupts the regular operation of the University or threatens the health, safety, or security of the University community." (Student Conduct Policy at 6.) Even on plaintiff's own submissions, it appears that NYU adhered to its own policies in

deeming Doe's unmasked, non-distanced behavior at an indoor gathering with several others a violation.

More significant than the NYU communications Doe cites in her support, however, are those that she failed to cite in her complaint and moving papers. In essence, plaintiff's claim, whether viewed as an Article 78 challenge or a contract action, boils down to the contention that NYU never expressed a clear intent to regulate off-campus conduct. In light of the record here, this contention holds no weight. As described in detail above, NYU issued repeated, clear, forceful notices to the student body that its Student Conduct Policy applied to off-campus conduct. As early as mid-August 2020, students were required to watch a video directing them to follow NYU's COVID-19 policies off-campus and to avoid bars and parties, and informing them that students found in violation could face suspension. (*See* Jolley Decl. Ex. 3.) Doe viewed this video and submitted a required acknowledgement that she had done so on August 18. (*Id.* ¶ 27.) Two weeks later, students received the September 3 guidance, instructing them to "*stay away from gatherings where there are no masks or distancing, even at off-campus private residences*." (*Id.* Ex. 4 (emphasis in original).) That notice explicitly stated that "if a student is found to have participated in a gathering that impacts the community's health and safety, including by violating public health guidelines, they will likely be suspended for one academic semester." (*Id.*) January 28 — two days before the dinner Doe attended — students received another email reiterating the continuing applicability of these policies. That notification expressly provided: "Regardless of the setting or the reason, the University's policies on mask-wearing and physical distancing remain in effect for all gatherings, and you will be held accountable for observing NYU's safety and health rules and any public health guidelines even if you are off-campus." (*Id.* Ex. 10.) On that same date, Doe viewed another required video reiterating NYU's COVID-19 policies and signed an acknowledgement to that effect. (*Id.* ¶ 36.) Indeed, NYU's electronic records reflect that she watched the video for nearly eight minutes. (*Id.* Ex. 8.)

Plaintiff can hardly claim ignorance of these clear policies; this incident represented her third disciplinary proceeding, despite her artful claim that "[p]rior to the events of this case, NYU has never disciplined me or charged me with any grounds for discipline." (Doe Decl. ¶ 4.) Indeed, one of these incidents – in which she allegedly attended a rooftop party, an allegation Doe denies – did in fact result in NYU formally charging her with violations of Sections B1 and E3 of the Student Conduct Policy, the same provisions under which she was later suspended. Moreover, after each proceeding OSC emailed her yet another copy of all applicable NYU COVID-19 policies and guidance. (Fread Decl. ¶¶ 6-10; Pl.'s Supp. Mem. Ex. 3.)

In response, plaintiff does not dispute that she was bound by these communications, guidance documents, and policies. Instead, she argues only that

12

"NYU's communications[,] whether by video, email, formal policy, or website updates were at best unclear to a student who is subject to the university's dynamic change in policy." (Pl.'s Reply at 6.) She acknowledges that she received NYU's September 3 guidance, but claims that she "received dozens of notifications from NYU about its response to the COVID-19 pandemic," and that she thus "did not open the correspondence until after commencing this litigation." (Pl.'s Supp. Mem. at 3-4.) She also admits that she opened the email she received after her second disciplinary proceeding—which included links to all relevant NYU policies and guidance—but claims that "[a]fter reviewing the portion of the email indicating no responsibility, I stopped reading [the] correspondence and closed the email." (Doe Supp. Decl. ¶ 19.)

Put simply and charitably, the Court finds Doe's arguments unpersuasive. Despite plaintiff's conclusory assertion that NYU's guidelines were "at best unclear," the university repeatedly communicated, in no uncertain terms, the off-campus applicability of its policies. NYU further left no doubt that attendance at such a gathering would "likely" result in a one-semester suspension. It is implausible that Doe, after two previous disciplinary encounters with the university, including the filing of formal charges against her, was unaware of the scope and sweep of NYU's COVID-19 restrictions. The manifestly violative behavior depicted in the photograph itself represents a breach of both NYU's guidelines and New York state COVID-19 regulations.

The Court accordingly finds that Doe has not established a likelihood of success on the merits. The evidence before the Court suggests that NYU properly followed its clearly stated policies when it suspended Doe for attending an indoor, off-campus gathering at which students were unmasked and failing to socially distance. Doe has certainly failed to demonstrate that NYU's sanction of suspension was "arbitrary and capricious or an abuse of discretion." N.Y. C.P.L.R. § 7803(3). And though a one-semester suspension for violating COVID-19 restrictions is a serious punishment, New York courts presented with similar lawsuits have found that it does not "shock the conscience." *See, e.g., Matter of Storino et al. v. New York Univ.*, No. 2020-04294 (1st Dep't Apr. 1, 2021); *Rosenberg v. New York Univ.*, No. 160326/2020 (Sup. Ct. N.Y. Cnty. Dec. 11, 2020). Indeed, although not necessary to resolve this motion, on the record before the Court NYU's conclusion that Doe violated NYU's clear COVID protocols and was subject to suspension was perfectly reasonable.[3]

---

[3] Because the Court has found that there is not a likelihood of Doe succeeding on the merits of her claim, it is not necessary to analyze whether Doe has demonstrated she is likely to suffer irreparable harm in the absence of preliminary relief, whether the balance of equities tips in Doe's favor, nor whether an injunction would be in the public interest.

### D. Plaintiff's Motion to Proceed Under a Pseudonym

Doe has also moved for permission to proceed under a pseudonym for the remainder of these proceedings. Though Rule 10(a) requires that "[t]he title of the complaint must name all the parties," courts have "nevertheless 'carved out a limited number of exceptions to the general requirements of disclosure.'" *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008) (quoting *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 685 (11th Cir. 2001)). The Second Circuit has laid out a non-exhaustive ten-factor balancing test to weigh the plaintiff's need for anonymity against the "countervailing interests in full disclosure." *Id.*

Here, the Court exercises its discretion under that balancing test, *see id.* at 189-90, to grant Doe's motion. Most relevantly, the Court believes that in this action, "identification poses a risk of retaliatory physical or mental harm to the party seeking to proceed anonymously." *Id.* at 190. Doe is 19 years old and in her first year of college, and though she of course made the decision to bring this lawsuit, the Court sees no reason to expose her to potential online retaliation for what some might characterize as reckless or selfish conduct. And, given her stated career goals (*see* Doe Decl. ¶ 7), plaintiff represents that revealing her identity in a lawsuit pertaining to her violations of COVID-19 protocols could impede her progress. The Court believes that NYU has sufficiently demonstrated the gravity of its COVID-19 disciplinary regime by forcefully litigating, and now prevailing on, Doe's challenge to its enforcement efforts. The equities here weigh in favor of maintaining Doe's anonymity.

### III. CONCLUSION

Because Doe is not likely to succeed on the merits of her claim, her motion for a preliminary injunction is denied and the temporary restraining order is dissolved. Her motion to proceed under a pseudonym is granted.

Dated: New York, New York
April 28, 2021

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.